IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 23, 2010 Session

## MICHAEL EUGENE WILKERSON v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Warren County**
**No. F-9147      Larry B. Stanley, Jr., Judge**

_____

**No. M2009-00561-CCA-R3-PC - Filed July 14, 2010**

_____

A Warren County jury convicted the Petitioner, Michael Eugene Wilkerson, of three counts of the sale of more than .5 grams of cocaine and one count of the casual exchange of marijuana, and the trial court sentenced him as a Range II, multiple offender to an effective sentence of fifty-seven years. On direct appeal, the Petitioner challenged the sufficiency of the evidence, and we affirmed the trial court's judgments. *State v. Michael Wilkerson*, No. M2005-02175-CCA-R3-CD, 2006 WL 2709240, at *1 (Tenn. Crim. App., at Nashville, Sept. 22, 2006), *no Tenn. R. App. P. 11 application filed*. The Petitioner then filed a petition for post-conviction relief in which he alleged that he received the ineffective assistance of counsel and that the State withheld exculpatory evidence. After a hearing, the post-conviction court dismissed the petition. After a thorough review of the record and applicable authorities, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, delivered the opinion of the Court, in which JERRY L. SMITH and THOMAS T. WOODALL, JJ., joined.

C. Brent Keeton, Manchester, Tennessee, for the Appellant, Michael Eugene Wilkerson.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Clarence E. Lutz, Assistant Attorney General; Lisa Zavagiannis, District Attorney General, for the Appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A. Background**

In our opinion on the Petitioner's direct appeal from his conviction, we recited the underlying facts supporting his conviction as follows:

Jason Rowland testified that he is an investigator with the District Attorney's office and a member of the Thirty-First Judicial District Drug Task Force. As a part of his drug task force duties, Rowland said he arranges undercover illicit drug buys through confidential informants. Rowland learned from Coffee County law enforcement officials that James Elam had knowledge of the availability of illicit drugs in Warren County.

In the present case Elam agreed with Rowland to serve as a confidential informant in a series of scheduled drug buys. Elam further agreed he would be paid on a case-by-case basis the sum of one hundred dollars per successful drug buy. Elam had no pending criminal charges.

Elam informed Mr. Rowland he knew the defendant Wilkerson and others were selling drugs in McMinnville and agreed to engage Wilkerson in a series of buys. Rowland testified that the procedure employed in the scheduled drug buys with the defendant was the same with each buy. On each occasion, Elam informed Rowland that he had information leading him to believe a buy could be made. Elam then met with Rowland at Rowland's office to obtain the money used to purchase the drugs. Each time Rowland physically searched Elam and Elam's automobile. Elam would then be wired with a low frequency transponder to enable Officer Rowland to both physically observe the transaction while monitoring and recording the audio portion.

Once Elam was wired, he would proceed to the rendevous point. Rowland would follow discreetly behind in an effort to observe the transaction and the individuals involved in the buy. When a buy was completed, Elam would return to Rowland's office where he and his automobile would be searched. Next, Elam would provide a written statement detailing the sale and would be paid his $100.00 for conducting the buy. The drugs were forwarded to the Tennessee Bureau of Investigation Crime Laboratory ("TBI") for testing.

The first scheduled buy from the defendant occurred on March 12, 2002. Both Elam and Officer Rowland testified that pursuant to the established procedure they met at Rowland's office, then Elam and his automobile were searched, Elam was wired and provided the funds necessary

-2-

to make the drug buy. Elam called the defendant and told him he wanted to purchase cocaine. According to Elam's testimony, he was directed to a trailer located on Smartt Station Road. Shortly thereafter, the defendant arrived at the location in a dark colored minivan. Elam purchased crack cocaine from the defendant.

Per the established protocol, Elam returned to Rowland's office with Rowland following in an unmarked vehicle. Elam and his vehicle were searched by Rowland. Elam provided a written statement about the buy and in return received his $100.00 payment. Rowland produced an audio tape of the transaction, including any conversation between the defendant and Elam.

The drugs purchased during the March 12, 2002, buy were examined by the TBI Crime Lab. TBI technician David Brown testified that the substance tested was positive for cocaine and weighed 1.4 grams.

The next scheduled buy occurred on March 17, 2002, following the same procedure utilized in the previous buy. Again after Elam and his vehicle were searched and Elam was wired and provided the drug buy funds, Elam called the defendant to arrange another buy at the defendant's home. Rowland testified that he followed Elam to the house maintaining a sufficient distance to avoid detection. Rowland acknowledged that he lost visual sight of Elam periodically but never lost audio.

Once Elam arrived at the defendant's home, Elam was directed to follow the defendant to another location. The defendant drove a black Chevrolet on the date of this buy. Rowland could not identify the driver but did observe the black Chevrolet vehicle. Officer Rowland followed both vehicles to the Cotten Apartments to Chris Cummings' apartment. The defendant and Cummings went into the apartment; however, Cummings came out alone and sat in the car with Mr. Elam. After some time, the defendant returned to the car while Cummings returned to his apartment. Elam paid Wilkerson and accepted a substance represented as cocaine. Again, the entire transaction was captured on audio tape by Rowland. Following the purchase, Elam returned to Rowland's office where he and his vehicle were searched. Elam delivered the purchased cocaine, gave a statement to Rowland about the buy, and received his $100.00 payment.

The rock-like substance purchased in the March 17, 2002, buy was

submitted to the TBI crime lab for testing. Adam Gray with the TBI crime lab testified that the substance was cocaine and weighed 1.1 grams.

A third drug buy took place on March 21, 2002. On this day, the same preparatory procedure was followed. On this particular occasion, Elam contacted the defendant and proceeded to defendant's family home in Highland Park Subdivision. Rowland testified that pursuant to the established procedure he followed Elam to the Wilkerson home. Initially upon arrival, the defendant was not home. Elam called the defendant, who directed Elam to return to the home where he ultimately met with the defendant. Rowland said he observed the same black Chevrolet automobile involved in the previous transaction. On this occasion, Elam purchased both cocaine and marijuana.

This third drug buy was also recorded via audio tape. After making the purchase, Rowland followed Elam back to his office where Elam was searched. Elam gave a written statement as to the specifics of the buy and received his $100.00. The purchased drugs were taken from Elam and submitted to the TBI crime lab for examination. On this last purchase David Brown of the TBI testified that the substances obtained testified positive for cocaine with total weight of 1.0 grams and for marijuana at a total weight of 7.3 grams.

Chris Cummings testified that he recalled Elam and the defendant coming to his apartment at Cotten Apartments on March 17, 2002. However, he said he had no knowledge of the drug transaction and was not present when it took place.

Defendant's mother, Joyce Wilkerson, testified that she listened to the audio tape recordings of the drug buys and recognized her voice on the recording of a telephone conversation between Elam and the defendant arranging a buy. However, she did not recognize any of the voices on the tape, including her son's voice. Ms. Wilkerson also testified that her son, Michael Wilkerson, was the owner of the black Chevrolet Caprice.

Eugene Wilkerson, the defendant's father, testified on behalf of his son. He said he reviewed the state's tape recordings of the transactions. While he could identify his son's voice on the March 21st transaction, he could not recognize the voice of his son on any of the other tapes.

Defendant Michael Wilkerson, who testified in his own defense, denied having any contact with Elam and further denied ever selling cocaine or marijuana to Elam. He said his father was in error in identifying defendant's voice on the March 21, 2002, tape recorded transaction.

Lorissa Elam, the estranged wife of Elam, testified that Elam was a drug user and had been using cocaine throughout the period of the time of these transactions and shortly before the trial of this matter.

The jury found the defendant guilty on all four counts.

The trial court sentenced the Petitioner as a Range II multiple offender, to nineteen years on each of the three felony convictions, which it further ordered to run consecutively. The trial court then sentenced the Petitioner to an eleven month, twenty-nine day sentence for the casual exchange conviction, to run concurrently with the felony sentences. The Defendant's total effective sentence was fifty-seven years in prison.

## B. Post-Conviction Hearing

The Petitioner filed a petition for post-conviction relief, which he later amended, alleging that he received the ineffective assistance of counsel and that the State had withheld exculpatory evidence. The Petitioner alleged he received the ineffective assistance of counsel because: (1) neither his trial counsel nor his appellate counsel raised the issue of "sentence entrapment" at sentencing or on appeal; (2) his trial counsel failed to file a motion to sever the offenses for separate trials; (3) his trial counsel failed to request a hearing on a motion to suppress the tape recording provided by the State's confidential informant; (4) his trial counsel did not file a motion for arrest histories of witnesses. Further, the Petitioner asserted that the State withheld exculpatory evidence, namely written statements from James Elam and Chris Cummings.

At the hearing on his petition, the following evidence was presented: Frank Buck testified he and his wife, Lena Buck, represented the Petitioner at trial. Mrs. Buck first agreed to represent the Petitioner, but because Mr. Buck had more trial experience, he became lead counsel on the case. Mr. Buck said that he stored the Petitioner's file in a barn he owned, but explained that, when a wall of the barn collapsed, he lost the Petitioner's file. He said he may have misfiled the Petitioner's file, which would have contributed to his being unable to find the Petitioner's file among the files behind the collapsed wall.

Mr. Buck identified a Motion for Severance his office manager located on an office computer. He said he provided it to the Petitioner's counsel on the day of the post-conviction

hearing and stated that he did not know why his manager had difficulty locating the document. Mr. Buck noted that the document had been signed by Mrs. Buck, who had done most of the preparation work on this case. Mr. Buck was confident the Petitioner met with Mrs. Buck at their offices on at least four or five occasions. Mr. Buck said he did not recall whether the document entitled Motion for Severance had been filed. Mr. Buck recalled that the Petitioner also faced charges related to the theft of a four-wheeler, which was, in the Petitioner's opinion, a weaker case. Mr. Buck testified that the motion to sever may not have been filed because the Bucks had doubts about whether Mr. Elam would show up to testify. Further, they were concerned about any conviction being used in the subsequent trial of the other charges. Mr. Buck recalled that the Petitioner's charges all stemmed from his actions within a thirty-day period of time. Mr. Buck conceded that the three counts of the indictment stemmed from sale of drugs on different dates, under different circumstances, and that the evidence supporting each count had differing respective strengths and weaknesses.

Mr. Buck believed the greatest weakness in the State's cases against the Petitioner was the search of informant Elam. He recalled the officer clearly admitted he did not conduct a body search of Elam or a search of Elam's vehicle and said that, in his opinion, the police did a "very sloppy job of the search." Mr. Buck also found the police's video taping of the conversations "sloppy," saying it took his staff hours to figure out what had been said on the recordings. Mr. Buck did not find the evidence against the Petitioner overwhelming, and he thought he had a chance to win the case.

Mr. Buck testified that Cummings's trial testimony differed from what the Petitioner told Mr. Buck that Cummings would say. Mr. Buck said the result in the Petitioner's case was not what they had hoped for, but he maintained that he took the action he thought was appropriate at the time.

Mr. Buck recalled that they filed a motion to suppress the tape recording provided by the State's informant. He said he did not know why that motion had not been heard but guessed, "[P]erhaps [we] thought that we didn't have a lot of confidence in our motion." He said he and Mrs. Buck would have pursued any motion that had a chance of winning.

Mr. Buck testified that they filed a motion for the disclosure of each witness's arrest history. While he did not specifically recall, he thought that the State gave him this information after the witnesses testified. Mr. Buck said he was unsure whether he ever presented to the trial court the theory of "sentence entrapment" during the sentencing phase of the Petitioner's case.

On cross-examination, Mr. Buck testified that, customarily in his office, Mrs. Buck prepares many of the motions, and Mr. Buck makes court appearances on behalf of their

-6-

clients.  Mr. Buck testified that he did not pursue the motion to sever the trials because they were not confident that they would prevail on the motion and the Petitioner indicated that he had a family connection with Elam, making the Petitioner doubt that Elam would testify for the State at the Petitioner's trial.

Mr. Buck reiterated that the police did not thoroughly search Elam or Elam's car before he purchased drugs from the Petitioner.  Mr. Buck opined that Elam easily could have set up the Petitioner.  In recalling the trial, Mr. Buck stated that he felt he successfully conveyed to the jury that the police had done a "sloppy" job in searching Elam.

Mr. Buck testified that the Petitioner told the Bucks that he had a witness who would testify that the Petitioner had not sold Elam drugs.  Mr. Buck recalled that he met with this witness but said she  did not tell him the same story that the Petitioner said she would tell, so he could not call her to testify.

Mr. Buck testified that the Petitioner testified on his own behalf at the trial and hurt his case when he did so.  At the time of trial, the Petitioner had twice been convicted of selling cocaine, a felony offense.  Mr. Buck and the prosecuting attorney agreed that the State would raise only the fact that the Petitioner had two felony convictions but not ask about the details of those convictions.  Mr. Buck testified he explained this to the Petitioner and told the Petitioner not to mention anything about those felonies or his prior cocaine selling convictions.  Nevertheless, the Petitioner stated during his trial testimony that he did not sell cocaine and he had never sold cocaine, which opened the door for the State to question him about his two prior convictions for selling cocaine.  Mr. Buck agreed the Defendant's prior convictions were from 2001, and he received an eight-year probationary sentence.  The trial in this case was held in 2004, while the Defendant was still on probation for committing the two previous drug selling offenses.

Mr. Buck recalled that, after the Petitioner was convicted in this case, he escaped and did not return to court.  Mr. Buck explained that this conduct negatively impacted the Petitioner's sentence.

The Petitioner testified that he was serving a sixty-two year sentence as a result of his convictions in this case.  The Petitioner said he did not feel Mr. Buck represented him zealously, explaining that Mr. Buck should have had some knowledge, through discovery perhaps, that Cummings would have appeared for trial, despite the Petitioner's assertions that Cummings would fail to appear.  The Petitioner disagreed with Mr. Buck's testimony that he met with the Bucks at their office on four or five occasions, stating that he had been incarcerated since his arrest on August 19, 2002.  Further, he explained, Mr. or Mrs. Buck would have had to visit him in jail, which neither did.  The Petitioner said his only meetings

with the Bucks occurred when he appeared at court, and Mr. Buck failed to communicate with him. The Petitioner recalled that he had only four or five court dates before his trial, and he met with the Bucks for only ten minutes at each appearance. The Petitioner said he reported Mr. Buck to the Board of Professional Responsibility, who made Mr. Buck "comply" and communicate with him.

The Petitioner mentioned several issues he felt the Bucks did not properly pursue. First, he testified that neither of the Bucks discussed with him the motion to sever his offenses for trial. They did not discuss with him the strategy of going forward or not going forward on that motion. Second, the Petitioner testified that neither of the Bucks raised the issue of "sentence entrapment" at his sentencing hearing. Third, the Petitioner asserted that the Bucks improperly failed to request a hearing on a motion to suppress a tape recording provided by the State's informant.

As to his second claim that the State failed to disclose exculpatory evidence, the Petitioner asserted that the State failed to provide him with written statements that Elam and Cummings gave to police. The Petitioner said the State failed to disclose those statements to Mr. Buck, and, if the State had, then Mr. Buck failed to give him copies of those statements.

On cross-examination, the Petitioner testified that he discussed with the Bucks the witnesses in his case only the night before his trial, when they met together for thirty minutes. The Petitioner recalled that his father paid the Bucks to represent him and that his father had met with the Bucks at their office. The Petitioner said his father informed him that the Bucks had a copy of a tape recording of the drug transaction, and he asked his father to listen to the tape recording of the confidential informant. The Petitioner agreed that the Bucks communicated with him via letters but stated that they only wrote him in response to his letters.

The Petitioner denied telling the Bucks that Elam or Cummings would not appear at court. The Petitioner stated that the Bucks advised him not to testify, but he explained that he testified anyway because he "had nothing to hide" because he "didn't sell this dope."

The Petitioner agreed that he escaped immediately after he was convicted. He said he was scared because the jury convicted him of a crime he did not commit. He agreed that this may have affected his sentence. The Petitioner agreed that Mr. Buck was aggressive against every witness, but he said Mr. Buck failed in his representation because he did not prevent Cummings from testifying.

Based upon this evidence, the post-conviction court dismissed the Petitioner's

petition, stating:

> Well, the Court finds that counsel for the [Petitioner] was not ineffective. Mr. Buck has tried several cases in front of this Court and I remember them trying this one. I didn't find any deficiencies at the time and as of today based on what I've heard I don't find any either.
>
> [The Petitioner] complains about some statements that were made that were not reviewed or something like that by his counsel but there is no evidence that even if that was true that anything would have changed. There is no proof as to how a statement would have been discredited or anything of that nature. So it doesn't really show this Court that there is any reason to believe the outcome would be any different even if the parties had been talked to or discovered or their statements had been turned over. I don't find that there was any wrongdoing but even if there was, there is no proof that it would have made any difference.
>
> Trial strategy, it's hard for the Court to second guess that. Mr. Buck apparently had fairly good reasons and explained his reasons for not arguing the motion to sever. As Mrs. Zavogiannis said, there is no proof, one that it would have been granted and number two, even if it had been granted there is not proof that the outcome would have been any different. Actually no reason to believe that whatsoever that the outcome would have changed. There are reasons to file those and reasons not to and I won't second guess an attorney who makes a relatively informed decision about whether or not to do that. It sounds like they had a reason to and again, there is no proof the outcome would have been any different.
>
> The sentence issue, I really don't see that as being a post-conviction issue. The sentencing hearing was held. I tried to follow the guidelines. The Court of Appeals has dealt with the issue of the sentence as far as I can tell, did not alter it and I don't know that the counsel at the sentencing didn't make any arguments that they should have made. I've never heard of this theory [the Petitioner's attorney] brought up. I guess he did a good job of finding that but sentence entrapment as far as I can tell is no more than just an inappropriate use of the sentencing guidelines in consecutive sentencing, which I think has been addressed and dealt with.
>
> So I don't find the trial counsel was ineffective at all. I think Mr. Buck did an appropriate job and argued the best he could the areas that he had to

argue and just didn't win. Like he said, just because the outcome isn't what you want [does not mean your attorney's representation] fell below the normal standard of care and so this court does not find the outcome would have been any different had Mr. or Mrs. Buck acted or performed any differently than they had.

## II. Analysis

On appeal, the Petitioner contends his trial counsel was ineffective for: (1) failing to raise the theory of sentence entrapment at his sentencing hearing; (2) failing to pursue a motion to sever his charges for trial; (3) failing to pursue a motion to suppress the tape recordings of the drug sales; (4) failing to pursue a motion for the arrest histories of the State's witnesses. The Petitioner also asserts the State failed to disclose to him the exculpatory statements of two witnesses.

### A. Ineffective Assistance of Counsel

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. *Id*. at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not

functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n. 38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

## 1. Sentence Entrapment

The Petitioner first contends that his trial counsel were ineffective for failing to argue sentence entrapment at his sentencing hearing and on appeal. He asserts that the imposition of consecutive sentences was improper because he was subject to "sentence entrapment" in that the length of his sentences was based upon the number of controlled buys arranged by law enforcement officials. *See State v. John Derrick Martin*, No. 01C01-9502-CR-00043, 1995 WL 747824, (Tenn. Crim. App., at Nashville, Dec. 19, 1995), *aff'd and remanded on other grounds*, 940 S.W.2d 567 (Tenn. 1997). The post-conviction court noted that it followed the sentencing guidelines when sentencing the Petitioner and that the Petitioner's sentence was appropriate. Our opinion in the Petitioner's direct appeal, shows his counsel argued only that the evidence was insufficient to sustain his conviction; his counsel did not appeal the sentence.

In *Martin*, the case the Petitioner points to in support of his argument, the defendant was arrested after four sales of cocaine to undercover agents in an aggregate amount of thirteen ounces. He was convicted and sentenced at trial as follows: for Counts One, Two, and Three (sale of cocaine), he was given a ten-year sentence on each count; for Count Four (possession of cocaine with the intent to sell), he was given a ten-year sentence; for Count Five (possession of drug paraphernalia), he was given a six-month sentence; for Count Six (driving on a suspended license), he was given a three-month sentence. The trial court imposed consecutive sentences for each conviction after finding that the defendant was a professional criminal and that he committed the offenses while on probation. The panel concluded that, while the defendant did qualify as a professional criminal and did in fact commit the offenses while on probation, the imposition of consecutive sentences was inappropriate because the "severity of the crimes could vary significantly depending upon the specific number of buys the officers chose to conduct and the amounts purchased in each buy." *Id*. at *5. Furthermore, the panel ruled that "forty years for the drug offenses is [not] reasonably related to the severity of these four crimes." *Id*. The defendant's sentence was modified so that "the two ten-year sentences on similar counts one and two will run concurrently with each other and concurrently with all of the other counts including the two misdemeanor offenses." *Id*. The remaining sentences were ordered to be served

consecutively. *Id*. The defendant's original sentence of forty years and nine months was thereby reduced to twenty years and nine months.

In another case addressing this issue, the defendant was convicted of three drug offenses and received three consecutive sentences. *See State v. Richard Lynn Norton*, No. E1999-00878-CCA-R3-CD, 2000 WL 1185384, at *9 (Tenn. Crim. App., at Knoxville, filed Aug. 22, 2000). Using the *Martin* rationale, the *Norton* panel reduced the defendant's sentence from thirty-six years to twenty-four years. *Id*. at *9-10. The Court reasoned that the "imposition of three consecutive sentences would permit investigating officers to dictate the length of a sentence based upon the number of controlled buys they arrange and the amounts purchased." *Id*. at *9.

In *State v. William Lewis Houston*, No. M1999-01430-CCA-R3-CD, 2000 WL 1793088 (Tenn. Crim. App., at Nashville, Dec. 7, 2000), this Court reduced a defendant's sentence from seventy-two years to forty-six years. *Id*. at *12-13. We stated

> The authorities continued to arrange controlled buys. Even though we conclude the defendant unquestionably qualified for consecutive sentencing based upon an extensive record of criminal activity, we find that the imposition of an effective seventy-two year sentence is not consistent with our general principles of sentencing. The sentence must be justly deserved, and no greater than that deserved, for the offenses. *Lane*, 3. S.W.3d at 460. We conclude defendant should serve four of his sentences, rather than six, consecutively. Thus, the defendant's convictions for sale of cocaine under indictments 8429, 8430, 8434, and 8435 shall be served consecutively to each other with all other sentences to be served concurrently. Therefore, in light of our reduction in the length of some of the defendant's sentences, we conclude the defendant's sentences shall be reduced from an effective term of seventy-two years to forty-six years.

> We recognize that this sentence is higher than those imposed in *Norton* and *Martin*. However, this defendant's drug and other criminal activity is more egregious. Two of the cases involved well over 26 grams of cocaine; namely, 49.1 grams and 80.5 grams. Five other cases involved well over 0.5 grams; namely, 1.9 grams, 6.7 grams, 13.9 grams, 20.3 grams and 17.2 grams. The counterfeit cocaine case was supposed to involve two ounces of cocaine. Furthermore, the evidence in this case reveals that the defendant had drug contacts across the United States. We conclude an effective sentence of forty-six years is appropriate under all the circumstances.

*Id*. at *13.

In *State v. Joseph Antonio Hough*, No. E2000-02728-CCA-R3-CD, 2002 WL 1483203 (Tenn. Crim. App. At Knoxville, July 11, 2002), *perm. app. denied* (Tenn. Dec. 9, 2002), this Court declined to reverse the trial court's imposition of consecutive sentences or to reduce the defendant's sentence. *Id*. at *8. In that case, the defendant was convicted of one count of delivering 0.5 grams or less of cocaine, a Class C felony, and one count of delivering 0.5 grams or more of cocaine, a Class B felony. *Id*. at *1. The trial court sentenced the Petitioner, a Range II offender, to eight years for the Class C felony and to fifteen years for the Class B felony and ordered that those sentences run consecutively. *Id*. This Court affirmed the trial court's order, stating:

> In *Norton*, *Martin*, and *Houston*, *supra*, this court modified the sentences imposed and instructed the trial court to order service of a number of the imposed sentences consecutively and the remainder concurrently. However, in the instant case, there were only two controlled purchases from the appellant. Notably, the second sale was actively sought by the appellant, not by Seabrook. We conclude that there was no error in ordering the appellant's two sentences be served consecutively.

*Id*. at *8.

In reviewing the evidence in the case presently before us, we conclude that the Petitioner's trial counsel and appellate counsel's representation fell below a reasonable standard during the sentencing phase of the Petitioner's case and on appeal. The sentencing transcript reveals that the Petitioner left after his trial and escaped. When he was later apprehended, police found him in possession of "quite a bit" of marijuana. At the sentencing hearing on his three cocaine convictions and the marijuana conviction, Mr. Buck made no mention or argument about consecutive sentencing, except to say, "Now those are the two (2) [new] charges that will probably get him consecutive sentencing because he is on probation now." Mr. Buck asked for the trial court's leniency. The attorney representing the Petitioner on appeal failed to appeal the issue of the Petitioner's consecutive sentences. We conclude that the failure by the Petitioner's counsel to raise the issue of "sentence entrapment" in and of itself was not ineffective. This is not a well known theory, and, while it might be prudent for defense counsel to raise this issue in appropriate cases, the failure to do so in this case did not fall below an objective standard of reasonableness.

We conclude that the Petitioner's trial and appellate counsels should have argued for concurrent sentencing, in light of other similar cases where the defendant was sentenced to an effective sentence much less than the Petitioner's effective sentence. *See State v. Michael*

*Lee Jeffcoat*, No. M2007-02330-CCA-R3-CD, 2008 WL 4830729, at *1 (Tenn. Crim. App., at Nashville, Nov. 6, 2008) (affirming the eighteen year effective sentence of a Range II offender who pled guilty to three counts of delivery of 26 grams or more of cocaine, a class B felony), *no Tenn. R. App. P. 11 application filed*; *State v. Taft Arkey Murphy*, No. M2007-00403-CCA-R3-CD, 2008 WL 4735494 at *1 (Tenn. Crim. App., at Nashville, Oct. 27, 2008) (affirming convictions of a defendant sentenced to an eighteen year effective sentence after being convicted by a jury of possession with intent to sell three hundred or more grams of cocaine in a school zone, a Class A felony; possession with intent to sell twenty-six or more grams of cocaine in a school zone, a Class A felony; sale of twenty-six or more grams of cocaine in a school zone, a Class A felony; two counts of sale of twenty-six or more grams of cocaine, a Class B felony; and possession of a handgun by a felon, a Class E felony), *perm. app. denied* (Tenn. Mar. 23, 2009); *Vincent Tracy Morton v. State*, No. M2007-00900-CCA-R3-CD, 2008 WL 2053071 *1 (Tenn. Crim. App., at Nashville, May 14, 2008) (affirming sentence of a Range I offender who pled guilty to three counts of sale of .5 grams or more of cocaine and was sentenced to a thirty-three year effective sentence), *Tenn. R. App. P. 11 application filed* (Tenn. Dec. 22, 2008); *State v. Stephen Massey*, No. M2001-02686-CCA-R3-CD, 2003 WL 21250850, at *1 (Tenn. Crim. App., at Nashville, May 30, 2003) (affirming the eighteen year sentence of a Range II offender found guilty of two counts of selling less than .5 grams of crack cocaine, a class C felony, and three counts of selling .5 grams or more of cocaine), *no Tenn. R. App. P. 11 application filed*; *State v. James Roosevelt Fleming*, No. W2001-01835-CCA-R3-CD, 2002 WL 1482793, at *1 (Tenn. Crim. App., at Jackson, Feb. 7, 2002) (affirming the twenty-six year effective sentence of a Range II offender convicted of three counts of selling .5 grams or more of cocaine), *no Tenn. R. App. P. 11 application filed*. The Petitioner's sentence of fifty-seven years seems, at least arguably, excessive in light of these sentences in similar drug cases. His trial counsel should have argued against consecutive sentencing to the trial court, and his appellate counsel should have appealed his sentence. Their failure to do so constituted deficient representation of the Petitioner.

In order to be entitled to post-conviction relief, however, the Petitioner must also prove by clear and convincing evidence that he was prejudiced. To do so, he must prove "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994). The facts of the Petitioner's case are clearly distinguishable from any of the aforementioned cases for several important reasons. The trial court found that the Petitioner was on probation for other drug-related offenses when he committed the drug sales that are the subject of this post-conviction petition. Further, the Petitioner escaped from State custody after being found guilty of these offenses. When he was apprehended, he was in

possession of a large amount of marijuana. The trial court based its imposition of consecutive sentencing on several factors: (1) that the Petitioner was an offender whose record of criminal activity is extensive; (2) the Petitioner committed an offense while on probation; (3) he committed a felony while on escape (referring to the new marijuana charges). When sentencing the Petitioner, the trial court noted the Petitioner's lack of credibility, his lack of remorse, and his "atrocious" criminal history. Under these circumstances, we cannot conclude that the Petitioner has proven by clear and convincing evidence that had his trial counsel argued for concurrent sentencing, the sentences would have been ordered to be served concurrently. Further, he has not proven that, had his appellate counsel raised the issue of consecutive sentencing, this Court would have reduced or modified his sentence. As such, we conclude he is not entitled to post-conviction relief.

### 2. Motion to Sever

The Petitioner next contends that his trial counsel erred when it did not pursue a motion to sever his offenses for trial. In his thorough and well researched brief, the Petitioner notes that there were three felony charges and each involved different witnesses and occurred on different days. He cites to many cases that stand for the proposition that cases such as these should be severed. In this case, however, the post-conviction court found Mr. Buck's testimony credible that the Petitioner told him before trial that Elam would not appear at trial. Elam was the confidential informant who purchased the drugs from the Petitioner. If Elam had not testified, the State would have had a difficult, if not impossible, prosecution of the Petitioner. Mr. Buck, therefore, decided not to pursue the motion for severance, hoping that Elam would not appear, as the Petitioner had maintained. This is a matter of trial strategy, one that would have likely been successful had Elam failed to appear in court. As previously stated, counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams*, 599 S.W.2d at 279-80. The Petitioner is not entitled to relief on this issue.

### 3. Motion to Suppress

The Petitioner next contends that his trial counsel was ineffective for failing to move to suppress the tape recording provided by the State's informant. At the post-conviction hearing, the Petitioner's trial counsel said he did not know why that motion had been filed but never heard. The post-conviction court found, "Such a motion would have likely failed in that no proof is before the Court why such a motion would have been granted."

This court has stated that, if arguable grounds exist to suppress incriminating evidence, an attorney, as a zealous advocate for the client, should move to suppress that evidence. *See Robert C. Bellafant v. State*, No. 01C01-9705-CC-00183, 1998 WL 242449,

at *5-6 (Tenn. Crim. App., at Nashville, May 15, 1998), *no Tenn. R. App. P. 11 application filed*. Where there are no arguable grounds to suppress, the attorney is not ineffective by refraining from filing a motion to suppress. *See Stephen Bernard Wlodarz v. State*, No. E2002-02798-CCA-R3-PC, 2003 WL 22868267, at *6 (Tenn. Crim. App., at Knoxville, Dec. 3, 2003), *perm. app. denied* (Tenn. May 17, 2004). Even if an attorney's failure to timely file or pursue the motion was deficient performance, the Petitioner must demonstrate that he was prejudiced by the deficiency. *See Thomas T. Nicholson v. State*, No. E2009-00213-CCA-R3-PC, 2010 WL 1980190, at *16 (Tenn. Crim. App., at Knoxville, May 12, 2010), *no Tenn. R. App. P. 11 application filed*.

The Petitioner bears the burden of establishing that the motion would have been granted if presented. Here, the Petitioner has failed to meet this burden. The Petitioner also failed to prove deficient performance or prejudice resulted from counsel's decision not to pursue the motion to suppress. The Petitioner's trial counsel said he would have pursued this motion had he thought there was a chance that he would have been successful. The Petitioner presented no evidence at the post-conviction hearing that this motion would have been successful. The Petitioner has not established that counsel was deficient or that he was prejudiced by counsel's failure to pursue this motion. The Petitioner is not entitled to relief on this issue.

### 4. Witnesses' Arrest Histories

The Petitioner next contends that his trial counsel was ineffective for not filing a motion for the arrest histories of the witnesses testifying at his trial. The post-conviction court found that the State "had no obligation to turn over 'arrest histories' of witnesses. Even if this were required there is no proof that these histories would have changed the outcome of the case." As the State notes in its brief, the Petitioner failed to introduce at the post-conviction hearing the arrest histories that he asserts trial counsel should have requested. The Petitioner presented no proof at the post-conviction hearing of how the arrest histories would have aided his defense. Under these circumstances, we conclude the Petitioner has not proven by clear and convincing evidence that his trial counsel's performance was deficient or that he was prejudiced by such performance.

### B. Witnesses' Statements

Finally, the Petitioner contends that he was not given written statements from Elam and Cummings, which "may have" contained exculpatory information. Further, he asserts that the failure of his trial and appellate counsel to raise this issue constitutes ineffective assistance of counsel. The post-conviction court found, "There is no proof that any statements of James Elam and Chris Cummings not turned over to the Defendant would have

been of any benefit to the Defendant or changed the outcome of the trial."

The Petitioner's claims stem from allegations that the State wrongfully suppressed evidence. In *Brady v. Maryland*, the United States Supreme Court held, "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Evidence that is "favorable to an accused" includes both "evidence deemed to be exculpatory in nature and evidence that could be used to impeach the State's witnesses." *Johnson v. State*, 38 S.W.3d 52, 55-56 (Tenn. 2001). Favorable evidence has also been defined as:

> evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness.

*Johnson*, 38 S.W.3d at 56-57 (quoting *Commonwealth v. Ellison*, 376 Mass. 1, 379 N.E.2d 560, 571 (1978)). The State has an obligation to disclose "any favorable evidence known to the others acting on the government's behalf in the case, including police." *Johnson*, 38 S.W.3d at 56 (quoting *Strickler v. Green*, 527 U.S. 263 (1999)). Additionally, "The duty to disclose exculpatory evidence extends to all 'favorable information' irrespective of whether the evidence is admissible at trial." *State v. Robinson*, 146 S.W.3d 469, 512 (Tenn. 2004) (citing *Johnson*, 38 S.W.3d at 56).

The State does not have an obligation to disclose information that is not in the possession or control of the State. *Id*. (citing *Banks v. State*, 556 S.W.2d 88, 90 (1977)). A defendant must prove the following four prerequisites in order to establish a violation of due process under Brady:

> 1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
>
> 2. The State must have suppressed the information;
>
> 3. The information must have been favorable to the accused; and
>
> 4. The information must have been material.

*State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). The defendant must prove a due process

violation by a preponderance of the evidence.  *Id*. (citing *State v. Spurlock*, 874 S.W.2d 602, 610 (Tenn. Crim. App. 1993)).

The Tennessee Supreme Court defined "material" within the context of Brady:

> Evidence is deemed to be material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." [A] reviewing court must determine whether the defendant has shown that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict." In other words, evidence is material when, because of its absence, the defendant failed to receive a fair trial, "understood as a trial resulting in a verdict worthy of confidence."

*Johnson*, 38 S.W.3d at 58 (citations omitted).  Our Supreme Court provided the following guidance for the review of *Brady* claims in the post-conviction context, "The "materiality" aspect of a *Brady* claim is governed by the same prejudice standard as an ineffective assistance of counsel claim; that is, *a defendant must show that there is a reasonable probability that the result of the proceedings would have been different*." *Cauthern v. State*, 145 S.W.3d at 571, 598-99 (Tenn. Crim. App. 2004) (emphasis added) (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

In the case under submission, the Petitioner alleges that this Court's opinion on direct appeal refers three times to written statements Elam and Cummings gave to police.  He asserts that he was never given copies of those statements.  We conclude the Petitioner has not proven that the State withheld this information or that the Petitioner's trial counsel did not receive this information.  He is not, therefore, entitled to relief on this issue.

### III.  Conclusion

After a thorough review of the record and the applicable authorities, we affirm the post-conviction court's dismissal of the Petitioner's petition for post-conviction relief.

_____
ROBERT W. WEDEMEYER, JUDGE